IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

SDI HOT SPRINGS, LLC, AND          )
SDI REALTY, INC.                   )
                                   )
        **Plaintiffs**             )
                                   )
vs.                                )        CIVIL CASE NO.  09-6084
                                   )
B & F ENGINEERING, INC.,           )
THE GARLAND COUNTY FAIR &          )
LIVESTOCK SHOW ASSOCIATION,        )
INC., GILBERT GARRETT,             )
GRANT GARRETT EXCAVATING,          )
INC., AND TRAVELERS CASUALTY       )
& SURETY COMPANY OF AMERICA        )
                                   )
        **Defendants**             )

## RESPONSE AND BRIEF TO SEPARATE DEFENDANT
## B&F ENGINEERING, INC'S MOTION TO STRIKE

Plaintiffs SDI Hot Springs, LLC, and SDI Realty, Inc., (collectively, "SDI") by and

through their attorneys, Perkins & Trotter, PLLC, and for their Response and Brief to Separate

Defendant B&F Engineering, Inc.'s ("B&F") Motion to Strike, state:

### I.    INTRODUCTION

B&F seeks to exclude Jerry Overton, PhD ("Dr. Overton") of ATOKA, Inc. ("ATOKA")

from providing expert testimony or an expert report in this matter on SDI's behalf.  B&F argues

that Dr. Overton was disclosed in an untimely manner and that his opinion and expertise were

obtained in a manner that violates notions of confidentiality and the work product doctrine as

well as the Arkansas Rules of Professional Conduct.  As will be shown below, however, Dr.

Overton was properly disclosed per this Court's scheduling order on November 29, 2011, as an

expert in the areas of geology, hydrogeology, and hazardous waste management.  Specifically,

his expert opinion will be relevant to the issue of whether B&F met its contractual obligations with respect to preparing a Phase I Environmental Site Assessment dated December 2005 and a subsequent addendum dated February 17, 2006.  Dr. Overton's expert report was also properly prepared based solely on his own review of documents provided by counsel for SDI as well as his significant expertise.  B&F places much emphasis on information volunteered to Dr. Overton by another ATOKA employee—Doug Fellenz ("Mr. Fellenz")—that he potentially prepared notes identifying problems with the reports while formerly employed by B&F.  That information, however, is not subject to any recognized protection.  Further, the brief conversation that occurred is itself not sufficient to warrant disqualification of Dr. Overton as an expert in this case.  Accordingly, the Motion to Strike should be denied.

## II.    ARGUMENT AND AUTHORITIES

### A.  **SDI properly served its expert disclosure on opposing counsel on the deadline set by this court and has fully met its obligations under Rule 26 with respect to that disclosure.**

B&F first argues that Dr. Overton's expert opinions should be excluded on the grounds that SDI's Rule 26(a)(2) disclosure of Dr. Overton as an expert was purportedly untimely.  As support for that contention, B&F notes that the Court's current scheduling order set the discovery cut-off date in this case as November 28, 2011.  What B&F neglects to identify, however, is that the court additionally set a separate deadline for the disclosure of experts.  In the first scheduling order entered in this case in January 2009, the Court set a trial date of September 20, 2010, and entered multiple other deadlines, including the following:

> **2. Discovery.**  As agreed by the parties, the discovery cutoff is sixty (60) days prior to the September 20, 2010 trial date (JULY 23, 2010). . . .
>
> **3. Motions**.  As agreed by the parties, potentially dispositive motions must be filed with the Clerk of Court thirty (30) days prior to the September 20, 2010 trial date (AUGUST 20, 2010). . . .

\*\*\*

**7. Expert disclosure.** Unless otherwise stipulated by the parties, expert disclosure must be made not later than 90 days prior to the scheduled trial date and rebuttal expert disclosure must be made within 30 days thereafter. These disclosures are not to be filed.

See Final Scheduling Order, Doc. 18 (Exhibit A).

In a subsequent scheduling order entered in May 2010, the Court continued the trial to January 10, 2011. The Court also extended the discovery deadline and the dispositive motion deadline. No mention was made of the expert disclosure deadline. Instead, the Court ordered, "All other deadlines are adjusted in accordance with the new trial date." *See* Order, Doc. 21 (Exhibit B). In November 2010, the Court once again continued the trial to June 13, 2011. The order also extended the discovery and dispositive motions deadline. As with the previous order for continuance, the Court again ordered, "All other deadlines are adjusted in accordance with the new trial date." *See* Order, Doc. 42 (Exhibit C). In March 2010, the Court continued trial one final time to its current setting of February 27, 2011. Utilizing language nearly identical to its previous orders, the Court extended the discovery and dispositive motions deadlines and ordered that "All other deadlines are adjusted in accordance with the new trial date." *See* Order, Doc. 52 (Exhibit D).

In its motion to strike, B&F argues that expert disclosures in this case were not provided by the discovery cut-off date. However, in its original scheduling order the Court clearly set a separate deadline for expert disclosures. No subsequent order continuing the trial in this case has somehow combined these separate deadlines. Instead, the Court's orders of continuance merely set new dates for trial, the discovery cutoff, and the dispositive motions deadline and then stated that all other deadlines set in the original scheduling order would be "adjusted in accordance

with the new trial date." The current trial date in this case is February 27, 2012. When adjusted in accordance with this new trial date, the deadline for expert disclosures as set in the Court's original scheduling order remains 90 days prior to trial which was November 29, 2010—the day that SDI served its Rule 26(a)(2) Expert Disclosure on the defendants in this case.

B&F accuses SDI of allowing the process here to "degenerate[] into a game of evasion." *See* Memorandum of Law in Support of Motion to Strike at 7. In support of that statement, B&F cites a number of cases where courts have found that information was not disclosed in a timely manner. Each of these decisions, however, was based on extreme facts that are not present here. Moreover, none involved an expert disclosure properly served on opposing counsel on the court-mandated deadline for such disclosures. *See Havenfield Corp. v. H&R Block, Inc.*, 509 F.2d 1263, 1271 (8th Cir. 1975) (new contentions on the issue of liability disclosed five or six weeks after the close of discovery); *Voegeli v. Lewis*, 568 F.2d 89, 96 (8th Cir. 1977) (expert disclosed four days after trial had started); *Minnkota Power Co-Op, Inc. v. Minitowoc Co.*, 669 F.2d 525, 528 (8th Cir. 1982) (expert disclosed three months after discovery deadline); *LCA Corp. v. Shell Oil Co.*, 916 F.2d 434, 440 (8th Cir. 1990) (expert disclosed seven days before trial); *Thibeault v. Square D Co.*, 960 F.2d 239, 241-42 (1st Cir. 1992) (seven experts disclosed four days prior to trial); *Fusco v. Gen. Motors Corp.*, 11 F.3d 259, 266 (1st Cir. 1993) (new exhibit disclosed "barely a month before trial"); *Freund v. Fleetwood Enter., Inc.*, 956 F.2d 354, 357-58 (1st Cir. 1992) (samples disclosed four days before trial and additional three-page document provided on day of trial); *Weiss v. Chrysler Motors Corp.*, 515 F.2d 449 (2nd Cir. 1975) (data supporting expert testimony not compiled and produced prior to trial); *Eastern Auto Distrib. v. Peugeot Motors of Am.*, 795 F.2d 329, 337-38 (4th Cir. 1986) (expert testimony excluded because it would violate the court's discovery limiting the scope of testimony and was based on

speculation); *Davis v. Marathon Oil*, 528 F.2d 395, 403 (6th Cir. 1975) (three additional witnesses identified three days before trial was to begin); *Grassi v. Info. Res., Inc.*, 63 F.3d 596, 603 (7th Cir. 1995) (two supplemental expert reports provided just as trial was commencing); *Jenkins v. Whittaker Corp.*, 785 F.2d 720, 727 (9th Cir. 1986) (expert not identified prior to trial); *Alimenta (U.S.A.), Inc. v. Anheuser-Busch Cos.*, 803 F.2d 1160 (11th Cir. 1986) (party refused to provide summary of expert's testimony and only allowed him to be deposed the day before trial began).

Contrary to these extreme cases that B&F identifies as constituting situations where counsel was found to have engaged in a "game of evasion," no such game has been attempted here.  It was not until late November while continuing to work on litigation strategy and trial preparation that counsel for SDI newly determined that a testifying expert was necessary to advance its claims at trial.  Dr. Overton was contacted at that time and asked to provide an expert report and testify at trial.  *See* Affidavit of Jerry Overton at ¶ 7 (Exhibit E).  Prior to being engaged as a testifying expert, Dr. Overton had merely served as a consultant to advise SDI's counsel on what he perceived to be the deficiencies in the Environmental Site Assessment Phase I Report and Addendum prepared by B&F.  *See id.* at ¶¶ 3-6; *see also* Fed. R. Civ. P. 26(b)(4)(D) ("Ordinarily, a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial."); *Lee v. Overbey*, No. 2:08-cv-02115, 2009 WL 4829198, at *5 (W.D. Ark. Dec. 9, 2009); *House v. Combined Ins. Co. of Am.*, 168 F.R.D. 236, 245 (N.D. Iowa 1996).  Dr. Overton submitted his final expert report to SDI's counsel on November 29, 2011.  *See* Exhibit E at ¶ 8.  That same day—which was also the deadline for expert disclosures—SDI served a 26(a)(2) expert

disclosure on opposing counsel that was accompanied by Dr. Overton's final expert report. In doing so, SDI followed in good faith the scheduling order entered by this Court.

Based on these facts, B&F has failed to show that exclusion of Dr. Overton's expert testimony is warranted under Rule 37(c)(1). The Rule provides that exclusion of information or a witness "unless the failure was substantially justified." Fed. R. Civ. P. 37(c)(1). As described above, SDI's disclosure of its expert on November 29, 2011 was justified—it was done on the expert disclosure deadline set by this Court. The timing of its disclosure of Dr. Overton as an expert witness was also harmless.

In its Motion to Strike, B&F complains that SDI's expert disclosure was made on November 29, the day after the November 28 discovery cut-off. In doing so, B&F implies that SDI could have properly made its expert disclosure on the discovery cut-off date. It is hard to imagine a reason why B&F would be prejudiced by an expert disclosure made on November 29 when it would not be prejudiced by a disclosure made only a day earlier. Additionally, B&F does not contend that the expert disclosure provided by SDI was in any way inadequate. As required by Rule 26(a)(2)(B), Dr. Overton's final report contains a complete statement of his opinions, the facts and data that he considered, the exhibits that will be used to support them, his resume, a list of other cases in which he has testified as an expert, and a statement of the compensation to be paid for his study and testimony in this case. *See* Fed. R. Civ. P. 26(a)(2)(B). Further, the 26(a)(2) expert disclosure that accompanied the report identified Dr. Overton as a potential expert witness, described his areas of expertise and his expected testimony, and provided Dr. Overton's address. B&F argues that SDI has yet to supplement its responses to certain discovery requests. However, those requests merely seek the information that has already

been provided in the expert disclosure that was made on the deadline for such disclosures set by this Court.

B&F also complains that it is prejudiced because it is unable to depose Dr. Overton or identify and provide any rebuttal experts of its own. This is simply untrue. Although Dr. Overton was disclosed more than a month ago, B&F has not requested to take his deposition or served any subpoena or notice compelling that he appear for deposition. SDI is perfectly willing to make Dr. Overton available for deposition at a time of mutual convenience or to agree to a continuance of the trial date to allow the deposition to occur. B&F's argument that it is prevented from identifying rebuttal experts is similarly displaced. As quoted above, the expert disclosure deadline set in the Court's scheduling provides that rebuttal experts may be disclosed within 30 days after an expert is disclosed by opposing counsel. *See* Exhibit A. In fact, this deadline is identical to the default timeline set forth in Federal Rule of Civil Procedure 26(a)(2)(D). The Rule states that absent a stipulation or court order expert disclosures must be made "at least 90 days before the date set for trial" and that rebuttal experts may then be identified "within 30 days after the other party's disclosure." Fed. R. Civ. P. 26(a)(2)(D). It is therefore implicit within the Rule that it is not prejudicial for an expert disclosure to be made within 90 days of trial and then rebuttal experts to be disclosed within the following 30 days. Here, SDI properly filed its expert disclosure within 90 days of trial (November 29, 2011). B&F then had 30 days (December 29, 2011) in which to designate any rebuttal experts. That it chose not to do so was through no fault of SDI.

Accordingly, B&F has failed to show that SDI's 26(a)(2) expert disclosure was untimely. It has also failed to demonstrate that exclusion of Dr. Overton is warranted under Rule 37(c)(1)

as SDI's expert disclosure on November 29, 2011, was substantially justified and harmless.  It would thus be improper to exclude Dr. Overton's expert testimony on the basis of timing.

### B.  Dr. Overton has no conflict-of-interest personal to him that prevents his testimony.

B&F next argues that Dr. Overton should be excluded from presenting his expert testimony at trial because he has a conflict of interest.  In doing so, B&F correctly notes that when considering the issue of an expert who has switched sides in litigation, "[d]etermination of whether disqualification of an expert on the ground of the expert's prior relationship with the party seeking disqualification" requires a two- part analysis:  (1) was it objectively reasonable for the first party who claims to have retained the expert to conclude that a confidential relationship; and (2) was any confidential or privileged information disclosed to the expert."  *Mays v. Reassure Am. Life Ins. Co.*, 293 F. Supp. 2d 954, 957 (E.D. Ark. 2003).  Courts, including an Arkansas federal court, have additionally considered the public interest in determining whether to preclude an expert from testifying.  *Id.*  Notably, however, this test explicitly states that the basis for exclusion to which this test applies is "on the ground of *the expert's* prior relationship with the party seeking disqualification."  *Id.* (emphasis added).  Here, it is never alleged that SDI's expert—Dr. Overton—did any work for B&F that is related to this matter.  Instead, Dr. Overton merely works at the same engineering firm as a former employee of B&F.

In such cases, other courts have declined to use the traditional two-part test to resolve a request to strike an expert.  In the context of an attorney, the doctrine of imputed disqualification would deem all attorneys in a firm as essentially one lawyer for purposes of loyalty to a client.  *Stencel v. Fairchild Corp.*, 174 F. Supp. 2d 1080, 1085 (C.D. Cal. 2011).  In other words, even if they have not worked on matters for a particular client, all attorneys in a firm are bound by the same duty of loyalty as those who actually perform work for a client.  *Id.*  "The same

considerations do not apply to experts, simply because they perform a very different function in litigation than do lawyers." *Id.* Unlike the attorney, an expert witness, like any fact witness, is bound to the truth first and the party second, if at all. *Id.* at 1086. Accordingly, the two-part test described above has little applicability to the idea of imputed disqualification of an expert. Instead, what is more relevant is whether the person who is alleged to have provided services to a previous client had any involvement in providing the expert services rendered to the second client.

For example, in *BP Amoco Chem. Co. v. Flint Hills Resources, LLC*, 500 F. Supp. 2d 957, 960 (N.D. Ill. 2007), an engineering firm employed 167 employees only three of whom had worked for the former client who was seeking disqualification of the entire firm. Upon determining that those three had not consulted, testified, or provided information to be used to author or review any expert report for the new client, the court found that there was a sufficient screen in place permitting the other engineers at the firm to be employed as litigation consultants. *Id.* at 961. Similarly, in *Stencel*, a party hired an expert who worked at the same technical consulting firm as another expert who had been consulted by the party's opponent. 174 F. Supp. 2d at 1087. The formerly consulted expert declared, however, that he had not disclosed any potentially confidential information he received during the party opponent's attempt to engage his services. *Id.* The expert who the party opponent sought to disqualify also declared that he had no direct access to any documents that his colleague may have drafted and that he would not have any access to such documents in the future. *Id.* The court stated that these facts "do[] not give the Court pause." *Id.* The court held, "even though the two experts in this case are both employed by [the same employer], a proper screen satisfactorily addresses the policy goal of protecting the confidentiality of [the party opponent's] work product." *Id.* It further explained

9

that a proper screen "need not be as restricting as would be appropriate for a conflicted attorney." *Id.*

Here, as in both *BP Amoco Chem. Co.* and *Stencel*, Dr. Overton has stated under oath that Mr. Fellenz "did not participate in any way in the preparation of the expert report for this lawsuit." Exhibit E at ¶ 18. He further states that he "did not rely on any statements made by Mr. Fellenz in the preparation of the expert report for this lawsuit." *Id.* at ¶ 19. In fact, nowhere in the report does Dr. Overton indicate that he relied on or even considered any information obtained from Mr. Fellenz. Mr. Fellenz did briefly approach Dr. Overton at one point and volunteer that he had been asked to review the Phase I Report and Addendum at issue in this case when he was still employed by B&F and made a list of problems with the report. *Id.* at ¶ 12. However, they did not discuss the specific deficiencies that had been previously identified by Mr. Fellenz nor did Mr. Fellenz disclose the contents of any conversation that he may have had with anyone else at B&F about his review of the report. *Id.* at ¶ 12. Mr. Fellenz and Dr. Overton had no additional conversations regarding any other matter at issue in this lawsuit. *Id.* at ¶ 12. Dr. Overton states that he was never provided with any notes, reports, or other documents concerning the Phase I Report and Addendum, Mr. Fellenz's review of the reports, or any other matter at issue in this lawsuit. *Id.* at ¶ 16. Indeed, the only information that was volunteered by Mr. Fellenz was that there might be in existence some notes regarding the adequacy of the two reports prepared by B&F. *Id.* at ¶ 16.

Simply learning of the existence of such notes is not protected by the work product doctrine or any other privilege. As one court has held with respect to discovery, "The doctrine 'does not apply to information sought as to whether there was such 'work product' but only to the information, if any, contained therein." *Smith v. Ins. Co. of N. Am.*, 30 F.R.D. 534, 538

(M.D. Tenn. 1962) (quoting *McCall v. Overseas Tankship Corp.*, 16 F.R.D. 467, 469 (S.D.N.Y. 1954)).  "Nor does it prevent inquiry 'as to the existence, if any, of the reports or other memoranda *** and of their location,' although the reports or their contents may perhaps turn out not to be subject to a disclosure order." *Id.* (emphasis in original) (quoting *Cities Serv. Oil Co. v. Celanese Corp. of Am.*, 14 F.R.D. 246, 249 (D. De. 1953)); *see also* 8 Charles Alan Wright, Arthur R. Miller, & Richard L. Marcus, Federal Practice & Procedure § 2023, 490-91. B&F cites a case in which it was held that selection of documents from a larger volume of documents may be protected by the work product doctrine. *See* Memorandum in Support of Motion to Strike at 10-11.  As distinguished by the Eighth Circuit, however, merely learning of the existence of potentially relevant documents is an entirely different matter. *See Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1329 (8th Cir. 1987) (acknowledging cases that "stand for the proposition that the work-product doctrine does not apply where the information sought is the existence or nonexistence of work product" and distinguishing questions that would reveal more).

Consequently, Mr. Fellez's revelation of the potential existence of some notes that may have been prepared for B&F alone is not enough to defeat the proper screen that was maintained by Dr. Overton.  Although federal courts have the inherent power to disqualify experts, "the cases that grant disqualification are rare." *Mays v. Reassure Am. Life Ins. Co.*, 293 F. Supp. 2d 954, 957 (E.D. Ark. 2003).  "Disqualification of an expert is a drastic remedy which courts should hesitate to impose except when absolutely necessary." *BP Amoco Chem. Co.*, 500 F. Supp. 2d at 960.  Here, because Dr. Overton prepared his report without Mr. Fellenz's involvement and without consideration of any comments or documents previously prepared by Mr. Fellenz, there are insufficient grounds for Dr. Overton's disqualification where it is not

alleged that he ever personally provided any expert opinions for B&F that relate to the instant lawsuit. *See TVT Records & TVT Music, Inc. v. The Island Def Jam Music Group*, 250 F. Supp. 2d 341 (S.D.N.Y. 2003) (denying motion to exclude expert reports and testimony where there it was not asserted that the report was based on information obtained from an opponent and the expert himself represented that he did not rely on any information previously conveyed to him).

Mr. Fellenz himself would in no way qualify as an expert in the area of the proper way to conduct and prepare a report regarding Phase I Environmental Site Assessments.[1]  However, even if the Court applies the traditional two-part analysis for expert switching to Mr. Fellenz, B&F has provided inadequate proof to merit disqualifying him personally.   The burden is on the party seeking disqualification to satisfy each of the elements of this test. *Mays*, 293 F. Supp. 2d at 957.  If either question is answered in the negative, disqualification is not appropriate. *BP Amoco Chem. Co.*, 500 F. Supp. 2d at 960.  "Thus, the party seeking disqualification has the heavy burden of showing both the existence of a confidential relationship and the transmission of confidential information, and cannot satisfy this burden relying on 'merely conclusory or ipse dixit assertions.'" *Id.* (quoting *Green, Tweed of Del., Inc. v. DuPont Dow Elastomers, LLC*, 202 F.R.D. 426, 429 (E.D. Pa. 2001)).  B&F has failed to meet this "heavy burden" here.

First, B&F has not presented sufficient proof that it had reasonable grounds to believe that a confidential relationship existed between Mr. Fellenz and B&F.  Most of the cases discussing this element refer to an expert who was specially retained for particular litigation. Mr. Fellenz was merely an employee of B&F at the time he was purportedly asked to review the Phase I Report and Addendum.  An Arkansas employee does have a limited duty of loyalty to his employer competition with an employer. *See Vigoro Indus., Inc. v. Crisp*, 82 F.3d 785, 788 (8th

---

[1] Lizette Feighl, the B&F employee who prepared the reports at issue in this case, testified at deposition that in 2005 she was the only person on staff at B&F qualified to do a Phase I Environmental Site Assessment. *See* Deposition of Lizette Feighl at 200:19-21 (Exhibit F).

Cir. 1996) (citing *Witmer v. Ark. Dailies, Inc.*, 202 Ark. 470, 151 S.W.2d 971 (1941)). "[A]n employer-employee relationship without more, however, is insufficient to cause a confidential relationship to exist as to knowledge naturally acquired during the employment." *See Walter E. Zemitzsch, Inc. v. Harrison*, 712 S.W.2d 418, 421 (Mo. App. E.D. 1986). "In order for there to be a confidential relationship between an employer and an employee there must be either an express understanding as to the confidential nature of the information or it must be acquired under such circumstances that the employee must necessarily be aware of the confidence reposed in him." *Id.* There has been no such proof here. B&F has not provided the Court with any express confidentiality agreement that it alleges covered the work performed by Mr. Fellenz. Additionally, it has not proffered any support which would indicate that Mr. Fellenz was necessarily aware that reviewing the Phase I Report and Addendum and preparing notes was intended to be protected in any way different from the technical work typical to his employment as an engineering intern for B&F. Indeed, the fact that Mr. Fellenz volunteered to Dr. Overton that he had prepared these notes underscores that it was not aware of any obligation to keep them confidential. Accordingly, B&F has failed to meet its "heavy burden" to show that a confidential relationship existed between itself and Mr. Fellenz. *See Mays*, 293 F. Supp. 2d at 958 ("Absent compelling equitable reasons to the contrary, any substantial ambiguity regarding whether there is a confidential relationship between an attorney and an expert should be resolved against the attorney seeking to invoke the relationship.").

Secondly, B&F has also failed to prove that B&F did, in fact, exchange confidential information with Mr. Fellenz. To constitute confidential information as used in the traditional two-party analysis for expert switching, "[t]he information that the party seeking disqualification provided to the expert must be particularly significant or clearly attorney work product or

attorney-client privileged information." *Veazey v. Hubbard*, No. 08-00293, 2008 WL 5188847, at *6 (D. Haw. Dec. 11, 2008); *see also Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087, 1094 (N.D. Cal. 2004).  Examples given by courts of confidential information include "discussion of the party's strategy in the litigation, the kinds of experts the party expected to retain, the party's view of the strengths and weaknesses of each side, the role of each of the party's experts to be hired and anticipated defenses." *Id.*  B&F has provided no evidence that any of these issues were discussed with Mr. Fellenz.  "Unlike attorney-client communications, discussions between parties or counsel and experts do not carry the presumption that confidential information was exchanged." *Id.*  "Because the burden is on the party seeking to disqualify the expert, that party should point to specific and unambiguous disclosures that if revealed would prejudice the party." *Id.*  As represented in the emails attached to B&F's Memorandum in Support of its Motion to Strike, it is believed the Mr. Fellenz merely provided a technical review of the Phase I Report and Addendum at the request of James Montgomery of B&F.  *See* Email dated November 29, 2011 (Exhibit G).  "[A]t least one court has concluded that '[c]ommunication based upon technical information as opposed to legal advice is not considered privileged.'"  *Hewlett-Packard Co.*, 330 F. Supp. 2d at 1094.

B&F contends that the notes prepared by Mr. Fellenz are nonetheless protected as work product made in anticipation of litigation:  "There can be no doubt that B&F was clear in April 2009 that SDI was threatening the litigation of which it is now embroiled."  *See* Memorandum in Support of Motion to Strike.  Gary Ryles of B&F presented a very different picture of the meeting that occurred in April 2009 at his deposition.  Mr. Ryles described that SDI represented at that meeting that it had found trash on the property.  *See* Deposition of Gary Ryles at 23:23-24:12; 25:2-7 (Exhibit H).  Mr. Ryles remembered that B&F then asked for evidence showing

the location and the volume of the material as well as for a copy of the geotechnical report and subcontract agreement. *Id.* at 24:6-12, 25:14-26:4.  Mr. Ryles stated, "We were not involved in any of that; but if they wanted us to help them, we needed to know some things that we didn't know and still don't know." *Id.* at 26:5-7.   Mr. Ryles later elaborated:

> **Q:   Okay.  Tell me everything you remember about the meeting, everything that was said back and forth, what the topics of conversation were.**
>
> A:    The – basically, I've already said – told what I – what I remember most, of course, which was a big surprise to me, was that they were looking to B&F Engineering to help them, I understood, recover some money from the fairgrounds because of some extra expense they had – thought they had been out on the site work.
>
> **Q:   What did they say about that?  Why were they looking to the fair?**
>
> A:    Or maybe it was probably the fairgrounds and their contractor, which would have been Garrett Excavating.

*Id.* at 37:19-38:8.  Additionally, Mr. Ryles couldn't recall that anyone with SDI stated at the meeting that they thought that the reports prepared by B&F had fallen below the applicable professional standard.  *Id.* at 42:15-20.  He did specifically recall, however, that SDI did not say at the meeting that they were going to sue B&F.  *Id.* at 43:6-13.  Indeed, when asked if the meeting was "fairly friendly," Mr. Ryles responded, "Oh, yes, yes." *Id.* at 27:2-3.

As relayed to B&F's counsel, Mr. Fellenz represented that his notes were made "at the same time or shortly after the meeting between SDI and B&F." *See* Exhibit G.  B&F references another purported conversation where SDI told Mr. Montgomery that it would have to get B&F's insurer involved.  *See* Memorandum in Support of Motion to Strike at 8.  However, B&F has provided no proof of when this alleged conversation occurred in relation to when Mr. Fellenz conducted his technical review.  The original complaint against B&F was not filed in this case until September 2009—long after Mr. Fellenz is understood to have reviewed the reports.  *See id.*

Accordingly, based on Mr. Ryles's recollection of the meeting, it is not objectively reasonable that Mr. Fellenz's review was conducted in anticipation of litigation. *See Sullivan v. Warminster Tp.*, 274 F.R.D. 147, 152 (E.D. Pa. 2011) ("[T]he party's anticipation of litigation [must] be objectively reasonable."); *see also Binks Mfg. Co. v. Nat'l Presto Indus., Inc.*, 709 F.2d 1109, 1120 (7th Cir. 1983) (distinguishing documents prepared based only on a "remote prospect of litigation").

Moreover, regardless of timing, a review conducted by Mr. Fellenz at the direction of Mr. Montgomery cannot properly be characterized as "attorney work product" as referenced in *Hewlett Packard*. The Supreme Court has long explained:

> At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case. But the doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system. One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself.

*United States v. Nobles*, 422 U.S. 225, 238-39 (1975); *see also Pamida, Inc. v. E.S. Originals, Inc.,* 281 F.3d 726, 752 (8th Cir. 2002). B&F has provided no evidence that Mr. Fellenz's review of the Phase I Report and Addendum were prepared by or at the direction of any attorney. Accordingly, B&F's argument that Mr. Fellenz's prior work constitutes the type of work product that could result in his disqualification as an expert is misplaced.

Lastly, the public interest also weighs in favor of allowing Dr. Overton to testify at trial. Policy considerations recognized by the Eighth Circuit as militating against disqualification include "ensuring that parties have access to expert witnesses who possess specialized knowledge and allowing experts to pursue their professional calling." *Mays*, 293 F. Supp. 2d at 957. In its Memorandum in Support of its Motion to Strike, B&F questions whether it is a

coincidence that Dr. Overton has been retained by SDI as a testifying expert.  *See* Memorandum in Support of Motion to Strike at 11.  What this implication fails to recognize, however, is that Hot Springs is a small community—and the Hot Springs private engineering community a much smaller one.  B&F has shown no actual evidence that SDI's hiring of Dr. Overton had anything to do with Mr. Fellenz's previous employment with B&F.  Further, as described above, Dr. Overton's report was prepared without assistance or input from Mr. Fellenz.  To disqualify Dr. Overton in such circumstances simply because he now works with Mr. Fellenz would prevent him from pursuing his profession.  It would also be fundamentally unfair to SDI.  Notably, B&F did not raise any of the confidentiality or work product arguments made in its Motion to Strike in response to either of the emails that it was sent by counsel for SDI requesting copies of Mr. Fellenz's notes.  *See* Exhibit G.  It only does so now—after the deadline to disclose experts has passed.  Consequently, even if the traditional expert shifting test for disqualification is applied here, B&F has failed to make a sufficient showing to support excluding Dr. Overton's expert testimony.

### C.  Neither Dr. Overton nor SDI have in their possession any confidential or privileged information.

For its final argument, B&F contends that this Court should exclude any confidential or privileged information obtained from Mr. Fellenz.  B&F alleges that counsel for SDI has obtained information from Mr. Fellenz in violation of Rule 4.2 of the Arkansas Rules of Professional Conduct.  To support this allegation, B&F cites nonbinding opinions from a variety of other jurisidictions.  It also acknowledges, however, that the U.S. District Court for the Western District of Arkansas has adopted the Arkansas Rules of Professional for attorneys practicing before it.  *See* W.D. Ark. R. 82.5(d).  Thus, only Arkansas law will be controlling.

Specifically applicable to communications with former employees, Arkansas Rule of

Professional Conduct 4.2 mandates:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law.

With respect to current employees of corporate clients, Comment 7 elaborates:

> In the case of a represented organization, this Rule prohibits communications with a constituent of the organization who supervises, directs or regularly consults with the organization's lawyer concerning the matter or has the authority to obligate the organization with respect to the matter or whose act or omission in connection with the matter or whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability.

This restriction, however, is inapplicable to former corporate employees.  Adopted by the

Arkansas Supreme Court in 2005, Comment 7 now continues:  "Consent of the organization's

lawyer is not required for communication with a former constituent."  Following this guidance,

SDI's counsel has made no attempt to communicate with any manager or officer of B&F.  It is

nor prevented under the Arkansas rules, however, from speaking with former employees such as

Mr. Fellenz who are not alleged to have directed or regularly consulted with B&F's lawyer, to

have had the authority to obligate B&F with respect to this matter, or to have committed any act

or omission that forms the basis of this lawsuit.  Accordingly, based on its understanding of Mr.

Fellenz's former role at B&F, it would not have been improper for SDI's counsel to have sought

out Mr. Fellenz to speak with him about this matter.

However, that is not even what happened with respect to the conversation of which B&F

complains.  Rather, as described under oath by Dr. Overton, Mr. Fellenz approached Dr. Overton

in his office to advise him that he had been contacted by Mr. Montgomery.  *See* Exhibit D at ¶ 9.

During the course of that brief conversation, Mr. Fellenz volunteered that he had made notes

listing problems with the Phase I Report and Addendum prepared by B&F.  *Id.* at ¶ 12.  Dr. Overton did not have any further discussion with Mr. Fellenz about those notes.  *Id.* at ¶¶ 13, 15.  Instead, he immediately notified SDI's counsel about the conversation.  *Id.* at ¶ 14.  In turn, SDI's counsel notified B&F's counsel of the communication that same day and requested the documents.  *See* Exhibit G.  B&F has not shown that SDI's counsel has had any further communication with Mr. Fellenz about his review of the reports or the contents of his notes—as indeed it has not.

Moreover, the only information that was relayed to Dr. Overton by Mr. Fellenz was that there were in existence, at one time, notes that may identify certain deficiencies with the Phase I Report and Addendum from Mr. Fellenz's viewpoint.  *See* Exhibit D at ¶ 17.  As explained above, knowledge of the mere existence of documents that may be subject to the work product privilege is not privileged.  *See Shelton v. Am. Motors Corp.*, 805 F.2d at 1329; *Smith v. Ins. Co. of N. Am.*, 30 F.R.D. at 538; *see also* 8 Charles Alan Wright, Arthur R. Miller, & Richard L. Marcus, Federal Practice & Procedure § 2023, 490-91.  Accordingly, B&F has failed to identify any protected information that SDI has had access to that should be excluded.  It has also failed to establish that SDI's counsel committed any violation of the Arkansas Rules of Professional Conduct.

WHEREFORE, Plaintiffs SDI Hot Springs, LLC, and SDI Hot Springs Realty, Inc., pray that the Court deny Separate Defendant B&F Engineering, Inc.'s Motion to Strike and that the Court grant all other just and proper relief to which SDI may be entitled.

Respectfully submitted,

PERKINS & TROTTER, PLLC
P.O. Box 251618
Little Rock, Arkansas 72225-1618
Telephone: (501) 603-9000/Fax: 603-0556


By: _/s/Kimberly D. Logue_____
John F. Peiserich (Ark. Bar #2002009)
jpeiserich@perkinstrotter.com
Kimberly D. Logue (Ark. Bar #2009242)
klogue@perkinstrotter.com
*Attorneys for Plaintiffs SDI Hot Springs, LLC*
*and SDI Realty, Inc.*

## CERTIFICATE OF SERVICE

I, Kimberly D. Logue, do hereby certify a true and correct copy of the foregoing pleading has been sent via electronic mail to the following counsel of record on this 3rd day of January, 2012:

Kevin A. Crass
Jamie Huffman Jones
Attorneys for B&F Engineering, Inc.
FRIDAY, ELDREDGE & CLARK, LLP
400 West Capitol Avenue, Suite 2000
Little Rock, AR 72201
crass@fridayfirm.com
jjones@fridayfirm.com

Charles R. Nestrud
Jason W. Earley
Attorneys for The Garland County Fair &
    Livestock Association, Inc.
CHISENHALL, NESTRUD & JULIAN, P.A.
400 West Capitol Avenue, Suite 2840
Little Rock, AR 72201
cnestrud@cnjlaw.com
jearley@cnjlaw.com

William P. Allison
Attorney for Gilbert Garrett and Grant Garrett
    Excavating, Inc.
ALLISON LAW FIRM, P.A.
1501 North University Avenue, Suite 220
Little Rock, AR 72207
wallison@allisonlawfirm.net

Vincent Ansinaux
Attorney for Travelers Casualty & Surety Company
    of America
WILSON, ELSER, MOSKOWITZ,
EDLMAN & DICKER LLP
901 Main Street, Suite 4800
Dallas, TX 75202
price.collins@wilsonelser.com

        _/s/Kimberly D. Logue_____
        Kimberly D. Logue